**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JIMMIE G. HINTZ,** | ) | **CASE NO.  1:09CV1182** |
| | ) | **(1:05CR113)** |
| Petitioner. | ) | |
| | ) | |
| vs. | ) | **JUDGE DAN AARON POLSTER** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Respondent. | ) | **AND ORDER** |

This case is before the Court on the following pending motions:

(1) Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 ("Motion or § 2255 Motion") (**ECF No. 123**);

(2) Request to Amend § 2255 Motion (**ECF No. 128**);

(3) Motion for Extension of Time to File Traverse (**ECF No. 129**); and

(4) Motion for Discovery (**ECF No. 130**).

For reasons explained below, the Court **DENIES** all pending motions and dismisses this case with prejudice.

**I.**

The Sixth Circuit Court of Appeals recently set forth the factual background of this case accurately and succinctly in *United States v. Hintz*, 267 Fed. App. 407, 2008 WL 508615 (6th Cir. Feb. 26, 2008):

In the afternoon of February 24, 2005, a gun-wielding, masked white man of medium build, wearing loose-fitting jeans and a blue shirt, entered National City Bank on Midway Boulevard in Elyria, Ohio, from its parking-lot entrance door.  Present were two tellers, the office manager, and one customer.  Upon demand, one teller gave the man money, including "bait money" - traceable bills that trigger an alarm when moved.  The bank's records showed that the alarm sounded at 1:13 p.m. and that the police were called at 1:15 p.m.  The robber then exited by the parking-lot doors through which he had entered.  As the robber was leaving, one teller saw in the parking lot the "back end of a newer looking car."  JA 83, 89, 92.  She did not notice it when the robber was entering the bank.  She could not see inside the car, as it was disappearing from her view.  A later audit showed that $2,189 was missing from the tellers' drawers.

A surveillance camera at a store near the bank had recorded two alternating views of the parking lot.  The video showed a stationary Ford Taurus in the parking lot at 1:07 p.m. facing southbound toward the bank.  At approximately 1:12 p.m., the car disappeared from the camera's view to the west (to the right).  At 1:16 p.m., the car reappeared in view as it moved toward the door at the bank.  There it paused, and a blur appeared on the passenger side of the Taurus indicating "some kind of activity."  JA 124, 127-28.  The Taurus then moved past the door, stayed there momentarily, and left the parking lot.  The video did not show how many people were in the Taurus.

Officers reviewed this video at the scene.  At about 1:48 p.m., they broadcast notice of an armed robbery by a white male in jeans and a blue shirt possibly traveling westbound on the Turnpike in a silver Ford Taurus with an Ohio plate.  An Ohio Highway Patrol Officer, Brian Hann, working on the Ohio Turnpike just west of Elyria that afternoon, received the dispatch and prepared to watch for the car.  A Taurus approached at about 2:12 p.m., appearing to be going the speed limit, with no visible license plate or registration on the front, and an Ohio plate in the rear.  As Officer Hann pulled behind the Taurus, it made an abrupt lane change and entered a service plaza.  Officer Hann followed the car into the plaza.  He observed the driver-later identified as co-defendant Jason Bricker-wearing blue jeans and a blue T-shirt as he exited the car to fuel it. There was also a passenger, later identified as Hintz.  Officer Hann called for backup and then followed the Taurus westbound at a normal speed.  When the Taurus exited the Turnpike, Hann and the backup officer pulled it over.

Officer Hann placed Bricker in handcuffs, told him that he was in investigative custody, and asked him where he was coming from.  Bricker replied that he was coming from Ashland, where he lived.  Hintz also said that he was coming from Ashland and that he was going to Finley to visit his girlfriend.  But Hintz then said that he was picked up in Elyria, where he lived at a mobile-home park.  Officer Hann read Hintz his *Miranda* rights, and then asked him more

questions, which led to Hintz's responses that he had known Bricker for about two years. Hintz said that he had no idea what time Bricker had picked him up.

The officers towed the Taurus to a garage where they conducted an inventory search in the presence of Bricker and Hintz. The officers discovered $2,079, including the bait money, in the console of the Taurus. Additionally, Bricker had $161 in his wallet, and Hintz had about $60 or $70 in his. In the trunk, there was a black, zipper-hood sweatshirt containing a loaded, .32-caliber revolver; a pair of white gloves; a blue ski mask; and black tennis shoes. In the back seat, there was a ski mask and black jacket. At some point the officers also learned that the Taurus's license plate had been reported stolen one week earlier.

The police suspected that Hintz was the getaway driver. Agent Edward Satterfield obtained a lead that the getaway driver might be someone other than Hintz. [FN1] Agent Satterfield interviewed that person at home about a week later; that person had an alibi for his whereabouts at the time of the robbery. To test Hintz's claim that Bricker had picked Hintz up at home after the robbery, Agent Satterfield, on another afternoon, drove the route he believed Bricker would have followed to do that. It took Agent Satterfield approximately 74 minutes to make the trip from the bank to Hintz's home and then to where Officer Hann spotted the Taurus - approximately 15 minutes longer than the time between the robbery and when Officer Hann actually spotted the Taurus.

FN1. The source of this lead (Bricker) was not identified to the jury.

On July 7, 2005, a federal grand jury in Cleveland, Ohio, returned a superseding indictment charging Hintz and Bricker with conspiracy to commit bank robbery, *see* 18 U.S.C. § 371 (Count 1); armed bank robbery, *see* 18 U.S.C. § 2112(a) and (d) (Count 2); and use of a firearm during a crime of violence, *see* 18 U.S.C. § 924(c)(1) (Count 3). Bricker plead guilty. On April 10, 2006, Hintz went to trial.

After presentation of the evidence discussed above, Hintz moved for acquittal. His attorney acknowledged that "it's clear that Jason Bricker committed this crime," but contended that there was "no substantial evidence" that Hintz was involved, "other than him being a passenger in the car." JA 303. The court denied the acquittal motion. The court explained that "[t]here certainly is evidence from which a jury could conclude beyond a reasonable doubt that a robbery was committed and that it was perpetrated by more than one person, someone other than Mr. Bricker, because someone was driving that car and moving that car, other than Mr. Bricker." JA 305. Additionally, "the jury . . . heard evidence that less than one hour after the bank was robbed, Mr. Hintz was found in the car with Mr. Bricker, along with over $2000 that was just sitting in

3

>the console, along with some clothing in the trunk and a gun that . . . the jury could conclude was used in the robbery." JA 305.
>
>In the ensuing closing argument, Hintz's attorney stated that it was possible to drive from the bank to where Officer Hann stopped the Taurus in less time than the hour it took before the Taurus actually was stopped, suggesting that Bricker had time to, and did, pick Hintz up after the robbery. The jury rejected this argument and found Hintz guilty on all three counts. The district court then sentenced Hintz to 30 years in prison: 5 years for conspiracy; 25 years for armed bank robbery (concurrent with the conspiracy sentence); and 5 years for use of a firearm during a crime of violence.

*United States v. Hintz*, 267 Fed. App. at 408-410, 2008 WL 508615 at *1-*3 (all citations to the Joint Appendix are omitted except for citations to quotations).

Hintz directly appealed his convictions, arguing that there was insufficient evidence to uphold them. On February 26, 2008, the Sixth Circuit affirmed the convictions, holding that there was sufficient circumstantial evidence to support the charges of conspiracy to commit armed bank robbery, aiding and abetting armed bank robbery and aiding and abetting the use or carrying of a firearm during a crime of violence. *Id.*

Hintz then filed the pending § 2255 Motion, presenting four grounds for relief. Hintz argues that (1) trial counsel was ineffective because he failed to sufficiently investigate certain alleged exculpatory facts; (2) trial counsel was ineffective because he failed to present any witnesses, evidence or exhibits supporting his defense; (3) appellate counsel was ineffective because he failed to raise trial counsel's ineffectiveness on direct appeal; and (4) cumulative errors, taken as a whole, reached a constitutional magnitude.

After promptly examining the § 2255 Motion, the Court directed the United States to file a brief responding to the Motion. (ECF No. 124). The government timely filed its

response brief (ECF No. 125), and Hintz's trial counsel filed an affidavit supplementing the government's response that explained in detail his efforts to investigate Hintz's case (ECF No. 126).

Hintz then filed a Motion for Extension of Time to File Traverse, asking the Court for a 60-day extension of time to file a reply to the government's response brief.  (ECF No. 127). Hintz contended that he needed the extension because he was:

> [i]n the process of securing several affidavits in support of his Motion.  The first is from co-defendant Jason Bricker (refuting the Government's claim that he did not receive a higher sentence for not falsely implicating Defendant-Petitioner as the getaway driver and also the claim that the government considered Bricker as unreliable and never requested his assistance. [see Government's Response, p. 18]).  Another affidavit will refute the Government's claims that the nearby Midway Mall did not have outside cameras that would have been useful in showing that Hintz was not the driver of the getaway car. [see Government's Opposition, pp. 15-16].

(Id. at 1-2).  The Court granted his request in a non-document entry dated July 13, 2009, and allowed Hintz to file a reply brief no later than September 14, 2009.

On September 15, 2009, rather than file a reply brief responding to the government's arguments, Hintz filed a Request to Amend § 2255 Motion to add another ground for relief.  (ECF No. 128.)  Hintz now argues that his conviction for aiding and abetting the use or carrying of a firearm during a crime of violence (Count 3) should be reversed because, under "the traditionally authoritative case controlling" this crime, i.e., *United States v. Medina*, 32 F.3d 40 (2d Cir. 1994), "the government fail[ed] to conclusively prove that the defendant ASSISTED with the gun in the specifically charged underlying crime."  (Id. at 4.)  He argues that trial counsel was ineffective for failing to raise this <u>legal</u> argument in the trial court, and appellate counsel was ineffective for failing to raise it on direct appeal.

On September 18, 2009, Hintz filed two more motions. He filed a Motion for Discovery, asking the Court to compel his trial counsel to produce records regarding his investigation of the case or, in the alternative, an opportunity to depose both trial counsel and appellate counsel or to hold an evidentiary hearing. (ECF No. 130.) Hintz also filed a Motion for Extension of Time to File Traverse. (ECF No. 129.) Therein, Hintz asks for yet another 60-day extension of time to file a reply to the government's response brief after the Court rules on his Request to Amend § 2255 Motion and his Motion for Discovery. (Id. at 1.)

The Court has reviewed the pending motions, briefs, the attachments and the entire record, and is prepared to issue its ruling.

**II.**

Under 28 U.S.C. § 2255, a federal district court may grant relief to a prisoner in custody under a sentence imposed by that court "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." *Id.* To prevail on a § 2255 claim, the petitioner must show a fundamental defect in the proceedings "which necessarily results in a complete miscarriage of justice or an egregious error violative of due process." *Nagi v. United States,* 90 F.3d 130, 133-34 (6th Cir. 1996) (quoting *Gall v. United States,* 21 F.3d 107, 109 (6th Cir. 1994)).

**III.**

In the § 2255 Motion, Hintz argues that his Sixth Amendment rights were violated due to ineffective assistance of trial and appellate counsel. (**ECF No. 123**.) A

petitioner seeking to prove ineffective assistance of counsel must first demonstrate that counsel was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate deficiency, a petitioner must show "that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Id.* (internal quotation omitted). A petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgement." *Id.* at 690. Furthermore, a reviewing court must "eliminate the distorting effects of hindsight [and] . . . evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

A petitioner must also prove that counsel's deficient performance prejudiced the defense. *Id.* at 687. Counsel's deficient performance is prejudicial if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Vasquez v. Bradshaw*, No. 07-4466, 2009 WL 2762747, at *6 (quoting *Strickland*, 466 U.S. at 694.)

"Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687. Unsupported allegations of ineffectiveness are insufficient to show that a petitioner's Sixth Amendment rights have been violated. "[T]he petition must be accompanied by a detailed and specific affidavit which shows the petitioner has actual proof of the allegations going beyond mere unsupported assertions." *Barry v. United States*, 528 F.2d 1094, 1101 (7th Cir. 1976).

### A. Trial Counsel's Alleged Ineffectiveness

Hintz' first two grounds for relief challenging the effectiveness of trial counsel are interrelated and will be discussed in this section. Hintz first argues that his trial counsel, James Ingalls, Esq., was ineffective because he failed to perform a sufficient investigation of the case. Hintz then argues that Attorney Ingalls was ineffective for failing to present at trial the witnesses and evidence he would have gleaned had he performed a sufficient investigation. More to the point, Hintz argues that if trial counsel had properly investigated his case and presented the evidence obtained therefrom at his trial, it would all have shown that the real getaway driver was a man named Chris Lavy.

Attorney Ingalls has provided an affidavit detailing his investigation efforts. (ECF No. 126 ("Ingalls Aff.").) Therein, Ingalls avers that he met with Hintz several times to discuss various aspects of the case including the government's evidence, and to identify potential witnesses Hintz would like him to interview or subpoena, and evidence Hintz would like him to review (Id. ¶¶ 2, 3); he interviewed Bricker, Lavy and Hintz's girlfriend and discussed the testimony they would present if called at trial (Id. ¶¶ 4, 5, 9, 10); he hired a private investigator to evaluate the timeline of events outlined by the government (Id. ¶ 8); he personally drove various routes to evaluate the timeline of events himself (Ingalls Aff. ¶ 9); and his decision not to call Bricker was a joint informed decision made by himself and Hintz (Id. ¶ 11). The Court finds this investigation to be reasonable under the circumstances.

In the Motion for Discovery, Hintz disputes Attorney Ingalls' assertion that he hired a private investigator, and asks for an opportunity to depose him and/or conduct discovery on this issue. Hintz contends that if counsel had in fact hired an investigator, the investigator

would have been able to show that Bricker had enough time to drop Chris Lavy off at the mall, pick Hintz up at his trailer and arrive at mile marker 100 in under an hour after the bank robbery. There are several problems with this contention.

Hintz cannot show that hiring a professional to "investigate" the route Agent Satterfield took, or to drive other routes and testify about them at trial, would have produced anything that would have improved upon Attorney Ingalls' thorough and impressive cross-examination of the government's only witness on this subject. Agent Satterfield testified that it would take half an hour to drop Lavy off at the mall and drive to Hintz's trailer before getting on the turnpike – and that it would take another 45 minutes, driving at 67 m.p.h., to drive to mile marker 100, where Hintz and Bricker were first detected by Officer Hann. Attorney Ingalls, undoubtedly aided by his own efforts in driving various routes, pointed out multiple problems with Agent Satterfield's timeline, e.g., the route Agent Satterfield chose to take despite numerous other possible and likely routes, and the presumed speed with which the getaway car traveled on or off the turnpike.

Hintz argues that an investigator would have obtained mall camera records that would contain images of Bricker dropping off Lavy at the mall before allegedly proceeding to Hintz's trailer. There are several problems with this argument. First, it is pure speculation by Hintz that there were other security cameras at Midway Mall and that such alleged cameras even had footage from the date of the robbery, let alone footage of Bricker, Lavy or Hintz. Second, Agent Satterfield interviewed Lavy and testified that Lavy had an alibi for the time the robbery was committed. Third, Attorney Ingalls interviewed Lavy and apparently decided not to call him as a witness. The Court must presume that Attorney Ingalls' decision not to call Lavy involved

the exercise of reasonable professional judgement. *Strickland*, 466 U.S. at 690. Fourth and most important, the only evidence in this case that Lavy was the getaway driver came from Jason Bricker – which brings us to Hintz's claim that Attorney Ingalls' decision not to call Bricker to testify at Hintz's trial constituted constitutionally ineffective assistance.

The decision to call or not call a defense witness is a tactical decision. There is a strong presumption that it was a reasonable professional decision. *Mooney v. Trombley*, No. 05-CV-71329-DT, 2007 WL 2331881 (E.D. Mich. Aug. 13, 2007) (citing *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987)). The record shows that Attorney Ingalls interviewed Bricker before the trial, and that the decision not to call Bricker was a joint, informed decision between him and Hintz. (Ingalls Aff. ¶¶ 4, 11.) Hintz, in his Motion for Discovery, does not dispute these statements in Ingalls' affidavit, and the Court must presume that Ingalls' decision not to call Bricker involved the exercise of reasonable professional judgment. *Id*. The record supports this decision.

At Bricker's sentencing hearing held one month before Hintz's trial, the Court asked Bricker, who admitted that he had robbed the bank with the assistance of a getaway driver, if he had informed the government of the driver's identity. (ECF No. 89 ("Bricker Sentencing Hr'g Tr.") at 4.) Bricker's attorney said that he had offered to provide that information to the Assistant U.S. Attorney who responded that he was not interested in hearing it. (Id.) When the Court inquired why the government was not interested, Assistant U.S. Attorney Gary Arbeznik responded that he did not believe Bricker would tell him the truth. (Id.) When pressed further by the Court on this subject, Attorney Arbeznik stated that, during plea discussions held in the Medina County Jail shortly after the robbery, Bricker expressed an interest, through his attorney,

10

in testifying that Hintz was the getaway driver if the government would agree to seek a substantial assistance reduction that would result in a sentence of between 8 and 12 years. (Id. at 13-14.) Attorney Arbeznik responded that the government could not structure a sentence quite that low. (Bricker Sentencing Hr'g Tr. at 14.) Attorney Arbeznik told the Court that he presumed Bricker's counsel was an honorable man and that he would not enter into an agreement through which his client would falsely accuse and help prosecute an innocent person just so his client could get a lower sentence. (Id.) Consequently, Attorney Arbeznik stated that he had no reason to believe Bricker's subsequent identification of Lavy as the getaway driver. (Id.)

Bricker then related to the Court a version of the robbery that was, at best, improbable. (See generally Bricker Sentencing Hr'g Tr. at 16-19.) Bricker stated that he stopped at Lavy's residence some time before the robbery, asked Lavy if he would drop Bricker off at the bank and, when Bricker left the bank and got in the car, would "just drive me off real quick." (Id. at 18.) Bricker first stated that Lavy was not involved in the planning of the robbery, then stated that Lavy agreed to help him rob the bank. (Id.) Bricker stated that, after the robbery, he dropped Lavy off at the mall across the street from the bank without giving him any of the proceeds of the robbery – although Bricker planned to split the proceeds with him – then headed down to Hintz's house to pick him up to go to a casino. (Id.) When Bricker finished his story, the Court asked him if he would say the same thing under oath if called as a witness by either party, to which he responded, "Correct." (Id. at 19.)

Given this incredulous story and Bricker's initial offer to identify Hintz as the getaway driver – all of which could be used to impeach Bricker, along with Bricker's criminal history, the fact that Bricker committed this robbery while on parole for a state aggravated

11

burglary conviction, the fact that there was another robbery for which Bricker was federally indicted, Bricker's admission that he had a getaway driver, and Hintz's presence in the car less than an hour later together with all the proceeds of the robbery, the Court concludes that Attorney Ingalls' decision not to call Bricker shows a reasonable exercise of professional judgment.

Hintz argues that Attorney Ingalls was incompetent for failing to properly cross-examine FBI agent Satterfield. Cross-examination decisions are delegated to counsel, not the defendant. The presumption of attorney competence operates with particular force when the conduct at issue is related to counsel's mode of cross-examination. Cross-examination, based on a trial strategy, is effectively insulated from review. *Hurley v. United States*, 10 Fed. App. 257, 260, 2001 WL 278704, at *3 (6th Cir. Mar. 12, 2001). *See also United States v. Steele*, 727 F.2d 580, 591 (6th Cir. 1984) (holding that cross-examination fell "within the area of trial tactics and strategy that should not be subjected to second guessing and hindsight" by the court). Hintz argues that when Ingalls questioned Satterfield about Bricker's hearsay statement that Lavy was the getaway driver, his defense was "emasculated" because it allowed Satterfield to testify that he had investigated the claim and the named individual had an alibi. Though it is true that Attorney Ingalls did allow this evidence in through his questioning, the government would have had this evidence available to use had Hintz's counsel called Bricker to testify, which he claims his counsel should have done. Attorney Ingalls elicited from Agent Satterfield that Bricker had named <u>someone other than Hintz</u> as the getaway driver without suffering the downside of the government's cross-examination of Bricker.

12

More importantly, without Bricker's testimony, the case against Hintz was a circumstantial evidence case only, and Attorney Ingalls did an excellent job of pointing out the lack of forensic evidence placing Hintz in the driver's seat of the getaway car.  For instance, he elicited testimony from Agent Satterfield that the government found nothing in the car, including clothes in the back seat and a knife found below the front seat, that belonged to Hintz; the government did not perform a DNA analysis on any items found in the car to trace them to Hintz; the government did not look for Hintz's fingerprints on the car keys, the steering wheel, the rear view mirror (which Hintz would have likely moved when he was driving the car), or the trunk; and the government did not perform an analysis of the bottom of Hintz's shoes to see if straw that was obviously sitting on the driver's side floor (and which was so thick it left a footprint mark) was on the bottom of Hintz's shoes.  He also elicited facts that supported Hintz's claim that he had been picked up after the robbery.  Although Hintz may have preferred different questions or a different manner of questioning, he has failed to show how counsel's cross-examination of Agent Satterfield deprived him of due process.

In short, the Court concludes that Hintz has failed to show that trial counsel's performance was deficient.  Because he has failed to make this showing, his ineffective assistance of trial counsel claims are denied.

### B. Appellate Counsel's Alleged Ineffectiveness

Hintz claims that his appellate counsel was ineffective for failing to raise a claim for ineffective assistance of trial counsel on direct appeal.  The Supreme Court has made clear, however, that it is preferable in most cases for ineffective assistance of counsel claims to be raised in § 2255 proceedings rather than on direct appeal.  See *Massaro v. United States*, 538

U.S. 500 (2003). Following *Massaro*, the Sixth Circuit has routinely concluded that such claims are best brought by a defendant in a § 2255 proceeding "so that the parties can develop an adequate record on this issue." *United States v. Weldon*, No. 06-6463, 2008 WL 904731, at *1 (6th Cir. Apr. 2, 2008) (citing *United States v. Martinez*, 430 F.3d 317, 338 (6th Cir. 2005) (citations omitted)). To the extent that Hintz claims appellate counsel was ineffective for failing to point out trial counsel's ineffectiveness, this claim fails because Hintz cannot show that trial counsel was constitutionally ineffective.

### C. Cumulative Errors

Hintz claims that he was denied due process and equal protection of the law under the Fourteenth Amendment as a result of cumulative errors occurring in the trial court. Those alleged errors are the ones he has brought in his § 2255 motion and other unidentified errors. Generally speaking, cumulative error claims are not cognizable on habeas review. *Cross v. Stovall*, 238 Fed. App. 32, 41 (6th Cir. 2007), *quoting Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006). To the extent Hintz's cumulative-error claim rests upon trial and appellate counsel's alleged ineffective performance, it fails because he has failed to show ineffectiveness on either counsel's part.

### IV.

In Hintz's initial motion for extension of 60 days to file a reply brief, which the Court granted, Hintz claimed that he needed the time to get an affidavit from Jason Bricker that would refute the government's claim that he did not receive a higher sentence for not falsely implicating him as the getaway driver, and another affidavit that would refute the government's

14

claim that Midway Mall did not have outside cameras that would have been useful in showing that Hintz was not the driver of the getaway car. Instead of filing a reply brief with these affidavits on the extended deadline, Hintz filed a Request to Amend his § 2255 Motion. (**ECF No. 128**.) Therein, he seeks to add a claim that trial and appellate counsel were ineffective for failing to make the purely legal argument that there was no evidence to support his conviction for aiding and abetting the use or carrying of a firearm in connection with a crime of violence in violation of 18 U.S.C. § 924(c). In support of this claim, Hintz relies primarily on *United States v. Medina*, 32 F.3d 40 (2nd Cir. 1994). He also relies on *United State v. Gardner*, 388 F.3d 700 (6th Cir. 2007), and *United States v. Franklin*, 415 F.3d 537 (6th Cir. 2005)

The Court denies this Motion. Despite Hintz's assertion to the contrary, this is a new claim never asserted before, and Hintz has failed to assert a basis for bringing it in an untimely manner.

Even if this were not the case, the Court would find that the claim is meritless for several reasons. First, Hintz has been convicted of conspiring to commit <u>armed</u> bank robbery with co-defendant Jason Bricker. Second, the Sixth Circuit has already found that there was sufficient evidence to convict Hintz of aiding and abetting the use or carrying of a firearm in connection with a crime of violence and affirmed the conviction. That is the law of the case. Third, suffice it to say that the standard set forth by the Second Circuit in *Medina* has no precedential value over this district court, and is significantly different than the Sixth Circuit standard set forth in *Franklin*.[1] The record shows that the Sixth Circuit employed the *Franklin*

---

[1] Under *Medina*, an aider or abettor cannot be convicted under § 924(c) "merely because he knew that a firearm would be used or carried and, with that knowledge, performed an act to facilitate or encourage the robbery itself." *Medina*, 32 F.3d at 45. Rather, the government must

standard when determining that there was sufficient evidence to convict Hintz of aiding and abetting the use or carrying of a firearm in connection with a crime of violence. Accordingly, this claim, if allowed, would be meritless.

### IV.

Several days after the extended deadline for Hintz to file a reply brief (when he filed, instead, the Request to Amend his § 2255 Motion), Hintz filed a Motion for Discovery asking for an opportunity to depose his trial and appellate counsel, to obtain discovery from them and/or to hold an evidentiary hearing (**ECF No. 130**). He simultaneously filed yet another Motion for Extension of Time to File Traverse, asking for 60 more days after the Court rules on his Request to Amend his § 225 Motion and his Motion for Discovery in which to file the reply brief that was due on September 14, 2009 (**ECF No. 129**). The Court finds that Hintz has failed to articulate a legitimate basis for allowing him to depose or conduct any type of discovery on his attorneys, who represented him competently in the trial court and on appeal. Accordingly, the Court denies the Motion for Discovery.

---

prove that the defendant "performed some act that directly facilitated or encouraged the use of carrying of a firearm." *Id*.

> Under *Franklin*, the government must prove only that the defendant:
>
> was a participant rather than merely a knowing spectator, that his presence at the scene of the crime was not surplusage, and that the crime would not have transpired without him. This can be satisfied if the accomplice knows that the principal is armed and acts with the intent to assist or influence the commission of the underlying predicate crime.

*Franklin*, 415 F.3d at 554. The Court also notes that *Medina* is distinguishable on the facts since the alleged aider and abettor was nowhere near the robbery when it occurred.

Because Hintz had no basis for filing frivolous motions and evading his September 14, 2009 deadline for filing a reply brief, the Court also denies the Motion for Extension.

### IV.

Based on the foregoing, the Court hereby **DENIES** the Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (**ECF No. 123**), the Request to Amend § 2255 Motion (**ECF No. 128**), the Motion for Extension of Time to File Traverse (**ECF No. 129**), and the Motion for Discovery (**ECF No. 130**).

**IT IS SO ORDERED.**

*/s/Dan Aaron Polster    September 28, 2009*
**Dan Aaron Polster**
**United States District Judge**